Keith Altman (P81702)
The Law Office of Keith Altman
Attorney for Plaintiffs
26700 Lahser Road, Suite 401
Southfield, MI  48033
(516)456-5885
kaltman@excololaw.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

ARI KRESCH, MERCHANT'S CREDIT
RECOURSE, LLC, JOHN MOLESKI, & JESSE
MOLESKI

Plaintiff,

vs.

DONALD MILLER, KYLE ARNESON, &
UNIVERSITY CAPITAL SOLUTIONS LLC,
AND DOES 1-50

Defendants.

## COMPLAINT

Plaintiffs Ari Kresch and Merchant's Credit Recourse, LLC, John Moleski, and Jesse Moleski,

by and through their attorneys, EXCOLO LAW, PLLC, respectfully allege the following:

## NATURE OF CASE

This is an action to recover damages for injuries sustained by Plaintiffs Ari Kresch, and Merchant's

Credit Recourse, LLC, John Moleski, and Jesse Moleski (collectively "Plaintiffs") as the direct and

proximate result of the fraud of Defendants to induce Plaintiffs to invest $646,460.39 with UCS and for

breach of contract.

## PARTIES AND JURISDICTION

1

1. Plaintiff Ari Kresch ("Kresch") is a domiciliary of San Juan, Puerto Rico. Kresch is the manager of Merchant's Credit Recourse, LLC. At all relevant times for this complaint, Kresch was a domiciliary of Michigan.

2. Plaintiff Merchant's Credit Recourse, LLC ("MCR") is a Michigan limited liability company located in the city of Southfield, Michigan specifically targeted at collecting on Michigan debt portfolios.

3. Plaintiff John Moleski is a resident of the City of Palm Beach, State of Florida and is a domiciliary of Florida. John Moleski is a CPA who performed debt collection projections for defendants. He was employed by Defendant University Capital Solutions. In addition, John Moleski invested money with Defendants.

4. Plaintiff Jesse Moleski is a domiciliary of the City of Syracuse, State of New York and John Moleski's father. Jesse Moleski invested money with Defendants.

5. Defendant Donald Miller ("Miller") upon information and belief is a domiciliary of Kent County Florida. He is also the Co-founder and manager of University Capital Solutions ("UCS").

6. Defendant Kyle Arneson ("Arneson") upon information and belief is a domiciliary of Cook County Illinois. He was also the VP of Capital Formation for UCS.

7. University Capital Solutions, LLC, ("UCS"), is a Florida limited liability corporation that allegedly purchased private student loan debt generated by the universities with the intent to collect on those debts. On September 27, 2013, UCS was placed in inactive status by the Florida Department of State for failure to file required annual reports.

8. The true names and capacities of Defendants DOES 1 through 50, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs, who therefore sues said Defendants by such fictitious names. Plaintiffs will amend their Complaint to allege said Doe Defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed and believe, and based

2

upon such information and belief alleges that each defendant designated herein is responsible in some actionable manner for the occurrences and injuries alleged herein.

9.  At all times herein mentioned, UCS, Miller, and Arneson, and each of them, were an owner, a co-owner, an agent, representative, partner, and/or alter ego of each other, or otherwise acting on behalf of each and every remaining defendant, and in doing the things hereinafter alleged, were acting within the course and scope of their authorities as an owner, a co-owner, an agent, representative, partner, and or alter ego of its co-Defendants, with the full knowledge, permission and consent of each and every remaining co-Defendant, each co- defendant having ratified the acts of the other co-Defendants.

10. Plaintiffs allege that there exists, and at all times herein mentioned existed, a unity of interest between UCS, Miller, and Arneson such that any individuality and separateness between the UCS, Miller, and, Arneson has ceased and that UCS, Miller, and Arneson is an alter ego of the others as follows:

   a.  At all times herein mentioned, Miller and Arneson was and is in active and direct participation in UCS as an officer and director and in doing the things hereinafter alleged, was acting within the course and scope of their authorities as an agent, representative, partner, and or alter ego of its UCS, with the full knowledge, permission and consent of each and every remaining co-Defendant, each co- defendant having ratified the acts of the other co- Defendants.

   b.  Plaintiffs allege that Miller and Arneson at all times herein mentioned, controlled and governed UCS.

   c.  Plaintiffs alleges that UCS is, and at all times herein mentioned was, a mere shell and sham. Said Corporate Defendant UCS was conceived, intended, and used by Miller and Arneson as a device to avoid individual liability.  Furthermore, because UCS failed to

3

follow laws and requirements of limited liability corporations within Florida, UCS was placed on inactive status and administratively dissolved in 2012.

d. Plaintiffs allege that Corporate Defendant UCS is, and at all times herein mentioned was, so inadequately capitalized that, compared with the business to be done by Corporation Defendant UCS and the risks of loss attendant thereto, its capitalization was illusory or trifling.

e. Plaintiffs allege that Corporate Defendant UCS is, and at all times mentioned herein was, a mere shell, instrumentality and conduit through which Miller and Arneson carried its business in the name of UCS exactly as they conducted it previous to incorporation exercising complete control and dominance of such business to such an extent that any individuality or separateness of UCS, Miller, and Arneson does not now, and at any time herein mentioned did not, exist.

f. Plaintiffs allege that UCS is, and at all times herein mentioned was, controlled, dominated, and operated by Miller and Arneson as their individual business and alter ego.

g. Plaintiffs allege that adherence to the fiction of separate existence of UCS as an entity distinct from Miller and Arneson would permit abuse of the corporate privilege and produce an inequitable result, thereby unfairly and deceptively conducting business.

11. Because of the acts, and omissions complained of hereinabove, UCS, Miller, and Arneson are jointly and severally liable, for all relief sought herein by Plaintiff.

12. UCS, Miller, and Arneson, conspired together to engage in the conduct complained of. Each Defendant knew of the tortious conduct and ratified the conduct through their individual actions.

13. The exact role of each Defendant as pertains to the instant case is known only to the Defendants.

14. When in this Complaint reference is made to any act of Defendants, such shall be deemed to mean that officers, directors, agents, employees, or representatives of the Defendant named in this lawsuit committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendant and did so while acting within the scope of their employment.

## VENUE AND JURISDICTION

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) (federal question jurisdiction) as this case arises out of federal laws 18 U.S.C. §1962(c) and 18 U.S.C. §1964. Under 28 U.S.C. § 1367, the Court may also exercise jurisdiction over Plaintiff's state law claims as they are all related to the same transactions with Defendants for which liability attaches under federal question jurisdiction.

16. Venue lies in this District pursuant to 28 U.S.C. §1391 because Plaintiff MCR is domiciled in this Judicial District, MCR and Kresch signed all contracts in this Judicial District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Judicial District. In addition, Defendants did business and/or transacted business in this Judicial District and, therefore, are subject to personal jurisdiction in this Judicial District.

## FACTUAL BACKGROUND
### A.  Plaintiffs Ari Kresch and Merchant's Credit Recourse, LLC

17. Plaintiffs incorporate by reference the allegations in all previous paragraphs

18. Plaintiff Ari Kresch owned and operated a debt buying business, Plaintiff MCR, specifically targeted at collecting on Michigan debt portfolios.

19. On February 16, 2012, Defendants approached Plaintiffs Kresch and MCR with an opportunity to purchase student loan debt  that Defendants claimed would fit the investing criterion of MCR's debt buying business.

20. Defendants went on to inform Kresch and MCR about University Capital Solutions. UCS was an organization, that purchased private student loan debt generated by the universities at a discount and then collected on it.

21.  Shortly after, Defendants had extensive conversations with Kresch and MCR  about the viability and profitability of coordinating a workable deal with UCS. At all times, Defendants represented that UCS already owned a significant amount of "student gap debt," including Michigan schools, for MCR to collect.

22.  Defendants sent Kresch and MCR  materials describing UCS's business operations and financial projections along with a link to a video presentation used for marketing to college presidents.

23.   Miller's agents represented that they had personally seen Miller's UCS office, that the "computer system" and supporting technologies were top notch, the operation was mature, and was producing revenue.

24.   On February 21, 2012, Defendants further asserted that UCS's Account Receivable Management services markets to over 2000 universities and 1200 colleges and are in negotiations with over 400. Additionally, it was explained that 52 private and public student loan lenders had been contacted through UCS's marketing efforts and as a result, UCS was currently purchasing such portfolios at deep discounts. It was advised that to date that UCS had over $400,000,000.00 (400 million) worth of portfolios booked and/or under contract for immediate purchase.

25.   Defendants further attached a breakdown of Michigan schools interested in selling UCS delinquent accounts.

26. Relying on the materials and representations authored and given by Miller personally and/or via his agents, Kresch and MCR  decided to enter into a note purchase agreement with UCS on March 7, 2012.  **Exhibit A**. On May 14, 2012, MCR wired $500,000.00 in accordance with the agreement.

27. As part of the note purchase agreement, MCR was provided with a Senior Corporate Debenture due March 7, 2013.  The essential term of the debenture was that MCR was to be repaid within one year at 12% interest.  UCS had the right to extend for an additional year.  No such extension was requested by UCS.  Thus, the entire amount of $560,000 was due and payable on March 7, 2013. No amounts were paid.

28. Further, UCS and MCR entered into a "collection servicing agreement" on May 23, 2012.  **Exhibit B**.  According to the collection servicing agreement, MCR would be the Exclusive Collection Agent for the State of Michigan in exchange for a $500,000.00 load to UCS discussed above that UCS would use to purchase debt portfolios for pennies on the dollar from educational institutions throughout the United States including institutions located in Michigan.

29. Throughout the course of business with Defendants, Kresch and MCR would frequently ask Defendants to  identify the Michigan portfolios that Defendants advertised about and when MCR could start collecting. Defendants led Kresch and MCR on for almost year with different excuses as to why there was no Michigan debt portfolios available. To this date MCR has never received a single Michigan debt portfolio from UCS.

30. In 2014, Kresch and MCR discovered that UCS never had any of the Michigan portfolios they claimed to have or any personal contacts with college and university presidents in Michigan.

31. Kresch and MCR also found out that the all of the representations regarding purchasing debt portfolios in Michigan were false and that Defendants never intended to buy any debt portfolios from Michigan.

32. Additionally, Plaintiffs later learned from the Illinois Department of Securities that the $500,000.00 they paid was not used to buy debt portfolios but was instead mainly placed into Miller and his agents' personal bank accounts:

    a. Donald Miller: $300,000

    b. Kyle Arneson: $37,000

## B. Plaintiff John Moleski

33. Plaintiffs incorporate by reference the allegations in all previous paragraphs

34. In 2011, Plaintiff Moleski was introduced to Defendants through a friend.

35. Shortly after meeting Defendants, Moleski agreed to work for Miller in April 2011.

36. Plaintiff Moleski worked for 15 months with Miller and UCS. Moleski created the recovery projections and analytics based on historic data that Defendants used to present UCS as a great investment opportunity.

37. Throughout his time working with Defendants, Moleski personally invested $85,960.39 into UCS.

38. Defendant's represented that Moleski would be hired as an executive and make $125,000 as a salary once the company got off the ground.

39. Through his many months working with Defendants, Plaintiff Moleski saw Defendants raise at least $1.1 million in investments into UCS (including his own $85,960.39 and Kresch/MCR's $500,0000.)

40. In his time working with Defendants, Moleski came into contact with many colleges and universities who were ready and willing to sell student loan debt portfolios to UCS.

41. Despite the clear interest and funds available, UCS spent at most $40,000 of the 1.1 million they raised in debt portfolios.

42. After months of work and almost $86,000 given in investments and loans, Moleski was only paid $10,000 in reimbursements.

43. Instead of taking the money and investing them in portfolios or into the company as promised Defendant's took the money and deposited it into their personal bank accounts.

44. Defendants additionally failed to provide Moleski any salary or payment for the work performed over the 15 months of employment.

**C.  Plaintiff Jesse Moleski**

45. Plaintiffs incorporate by reference the allegations in all previous paragraphs

46. John's father, Jesse Moleski, learned of UCS and all of the representations that Miller made to John following John's investment with UCS.

47. Based off of the representations and materials provided to his son, Jesse Moleski decided that he too would like to invest into UCS.

48. On May 4, 2011, Miller emailed a subscription agreement to John to give his father to sign.

49. Following the execution of the agreement Jesse wired $60,500.00 to UCS.

50. Instead of taking the money and investing them in portfolios or into the company as promised Defendant's took the money and deposited it into their personal bank accounts.

**D.  Facts Common to All Plaintiffs**

51. Plaintiffs incorporate by reference the allegations in all previous paragraphs

52. Defendants acted together and individually in systematically misrepresenting UCS' intent to use the investments and dividends to buy portfolios or grow the business as mentioned above.

53. The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiffs, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended to mislead Plaintiffs.

54. Plaintiffs were actually misled and deceived and were induced by Defendant to invest hundreds of thousands of dollars into UCS which they would not otherwise have invested.

55. Plaintiffs acted reasonably in relying that Defendants representations about intent to use the investments and dividends to buy portfolios and grow the business and had no reasonable way to determine that these assertions were not accurate.

56. Defendants took the monies Plaintiffs reasonably invested into UCS and deposited it into their personal bank accounts.

57. As a result of the conduct of Defendants, Plaintiffs have been damaged in the amount of $646,460.39.

## DISCOVERY RULE, TOLLING, AND FRAUDULENT CONCEALMENT

58. Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein.

59. Plaintiffs hereby allege and assert any and all applicable state statutory and common law claims, rights, theories, and/or principles of tolling or extension of any and all applicable statute(s) of limitations and statute(s) of repose, including but not necessarily limited to equitable tolling, delayed discovery, discovery rule, and fraudulent concealment.

60. Plaintiffs plead that the discovery rule should be applied to toll the running of any applicable statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and/or diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injuries.

61. Despite diligent investigation by Plaintiffs into their injuries and the cause of their injuries, the nature of Defendant's fraudulent conduct was not discovered, and through reasonable care and/or diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate application of the discovery rule, Plaintiffs' suit was

filed within the applicable statutory limitations period.

62. Any applicable statute of limitations is tolled due to equitable tolling.   Defendants are estopped from asserting a statute of limitations defense due to the fraudulent concealment of Defendants, and/or their predecessors in interest and/or their subsidiaries, through affirmative misrepresentations and omissions to Plaintiffs.  As a result of said fraudulent concealment, Plaintiffs' were unaware, and could not have learned through reasonable care and/or diligence, of the true nature of Defendants fraudulent conduct.

63. Defendants are estopped from asserting a statute of limitations defense because Defendants, and/or their predecessors in interest and/or their subsidiaries, defrauded Plaintiffs and fraudulently concealed from Plaintiffs the connection between their losses and the acts and omissions of Defendants, and/or their predecessors in interest and/or their subsidiaries.

## COUNT I: BREACH OF CONTRACT FOR PLAINTIFFS MCR & KRESCH

64. Kresch and MCR incorporates by reference the   allegations made in   all previous paragraphs.

65. Plaintiffs and Defendants Miller & UCS entered into a note purchase agreement attached as **Exhibit A**.  The parties initialed each page of the agreement and signed the agreement.

66. Plaintiffs provided consideration by paying $500,000.  Miller and UCS provided consideration in the form of a Senior Corporate Debenture due March 7, 2013 for $500,000 at 12% interest.  Furthermore, by subscribing to the Debenture, UCS allowed MCR to be the Exclusive Collection Agent for the MCR accounts located within the State of Michigan.

67. The parties accepted to terms of the agreement as exhibited by their signatures being affixed to the contract and by Plaintiff performing the required services in reliance that Plaintiff would be allowed to collect Michigan Portfolios and receive fees for the provision of those services.

68. Both parties understood the terms of the agreement.  The agreement was drafted by Miller, an

11

attorney.  Plaintiff provided the funds as described in the contract.

69. A valid contract existed because all of the elements requiring the formation of a contract were satisfied.

70. Plaintiffs performed by paying $500,000.

71. Defendant's benefitted from Plaintiff's services provided under the contract, **Exhibit A** in that Defendants received $500,000.

72. Thus, MCR and UCS entered into a valid agreement for the purchase of a note.

73. To date, Defendants have defaulted on the terms of the Debenture by not making any payments in accordance with the Debenture.

74. MCR and UCS also entered into a Collection Servicing Agreement on May 23,2012.  **Exhibit B.** This agreement was initialed on each page and signed by MCR and UCS.  MCR provided consideration by entering into a $500,000 Debenture subscription with UCS.  UCS provided consideration by making MCR the exclusive collection agent for Michigan loans.  Thus, a valid contract existed between MCR and UCS for collection servicing in the state of Michigan.

75. As acknowledged in section 2.01(2)(a), MCR made a debt investment of $500,000 in UCS.

76. To this day Plaintiffs Kresch and MCR have never received a single Michigan debt portfolio from Defendants.

77. Plaintiff has been further damaged by Defendants because they did not earn profits from collections of delinquent loans in an amount to be determined at trial.

78. WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendant in the amount of at least $500,000 together with interest, costs, attorneys' fees, and any other relief that the Court deems just and equitable under the circumstances.

## COUNT II: BREACH OF CONTRACT FOR PLAINTIFF JOHN MOLESKI

79. Plaintiff incorporates by reference the  allegations made in  all previous paragraphs.

80. John Moleski and Defendants Miller & UCS entered into a contract whereby in exchange for $25,000 from John Moleski, UCS provided John Moleski with a Senior Convertible Balloon Promissory Note attached as **Exhibit C**.  Payment of $25,000 at 12% interest was due Moleski on May 9, 2012.

81. As shown in **Exhibit C**, Moleski paid $25,000 to UCS.

82. To Date, UCS has failed to make any payments as required by the note.

83. UCS had an option to extend the note by one year.  UCS did not make payment on May 9, 2012 and thus extended the note for an additional year making the payment due on May 9, 2013.

84. Moleski is due at least $31,660 plus interest from May 9, 2013 plus attorneys' fees and court costs associated with enforcement of the note.

85. Moleski made additional investments on substantially the same terms.  The amount of these investments will be proven at trial.

86. WHEREFORE, Plaintiff John Moleski requests that this Court enter judgment in its favor and against Defendant in the amount to be proven at trial plus reasonable attorneys' fees and costs and any other relief that the Court deems just and equitable under the circumstances.

### COUNT III: BREACH OF CONTRACT FOR PLAINTIFF JESSE MOLESKI

87. Plaintiff incorporates by reference the  allegations made in  all previous paragraphs.

88. Jesse Moleski and Defendants Miller & UCS entered into a subscription agreement by which Jesse Moleski invested $60,500 and UCS provided Moleski with an equity interest in UCS.

89. Each party understood the subscription agreement, there was an offer, acceptance, and consideration exchanged.  Therefore, UCS and Jesse Moleski entered into a valid, enforceable contract.

90. The funds provided by Jesse Moleski were to be used for the acquisition of delinquent loan

13

portfolios.  No such portfolios were ever acquired.

91. Although Jesse Moleski has fully performed under the contract, UCS has breached its duties under the subscription agreement.

92. Jesse Moleski is due at least $60,500 plus attorneys' fees and court costs associated with enforcement of the note.

93. WHEREFORE, Plaintiff Jesse Moleski requests that this Court enter judgment in its favor and against Defendant in the amount to be proven at trial plus reasonable attorneys' fees and costs and any other relief that the Court deems just and equitable under the circumstances.

## COUNT IV: FRAUD FOR PLAINTIFFS MCR & KRESCH

94. Plaintiffs incorporates by reference the allegations in all previous paragraphs.

95. Defendants knowingly made several representations to Plaintiffs Kresch/MCR in respect to UCS already owning and/or looking to purchase Michigan debt portfolios, Defendants' intention of paying dividends, and using Plaintiffs' money to buy portfolios from educational institutions that in part would be given to MCR to collect upon.

96. Defendants knew these statements were false and never intended to buy any debt portfolios from Michigan.

97. Miller and his agents made the above knowingly false statements for the purpose of causing Plaintiffs to rely on those representations and invest a total of $500,000.00.

98. Plaintiffs relied on these knowingly false statements and invested $500,000.00.

99. Rather than using Plaintiffs' money to grow the business or buy portfolios from educational institutions as he represented, Miller deposited Plaintiffs' investment into his personal bank accounts and the personal bank accounts of his agents.

14

100. Communications with Plaintiffs by Defendants after the initial investment were knowingly designed by Defendants to lull Plaintiffs in to believing their investments were sound and that Plaintiffs would be provided with collection portfolios to collect upon.

101. As a direct and proximate cause of the Miller's illegal actions, Plaintiffs incurred damages of at least $500,000.00.

102. WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendant in the amount of at least $500,000.00 together with interest, costs, attorneys' fees, and any other relief that the Court deems just and equitable under the circumstances.

## COUNT V: NEGLIGENT MISREPRESENTATION FOR ALL PLAINTIFFS

103. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

104. Defendants had a duty to provide honest and accurate information to investors so that they could make informed decisions when deciding where to invest.

105. Defendants specifically and expressly misrepresented material facts to Plaintiffs, as discussed above. Each Defendant was aware that UCS did not own and/or was not looking to purchase Michigan or any collectable debt portfolios, that Defendants' had no intention of paying dividends, looking to hire anyone as an executive, and that Defendants had no intention of using Plaintiffs' money to buy portfolios from educational institutions or to grow the business.

106. Defendants knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable investor would be misled by Defendants misleading and deceptive representations.

107. Each Defendant was aware that the information provided to investors about UCS' intentions, was not accurate.

15

108. Plaintiffs justifiably relied on Defendant's misrepresentations and have been damaged thereby in an amount of at least $646,460.39.

109. WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendant in the amount of at least $646,460.39. together with interest, costs, attorneys' fees, and any other relief that the Court deems just and equitable under the circumstances.

### COUNT VI: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §1962(c) FOR PLAINTIFFS KRESCH AND MCR

110. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

111. The association of University Capital Solutions, Donald Miller, and Kyle Arneson (cumulatively, the "Conspirators"), constituted an enterprise within the meaning of 18 U.S.C. §1961(c), which enterprise was engaged in, and whose activities affected, interstate and foreign commerce. This enterprise was continuous in that it lasted for more than 4 years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

112. Each Conspirator is a person within the meaning of 18 U.S.C. §1961(3) and separate from the enterprise.

113. Defendant Donald Miller was in charge of all its operations. As such, he set up, orchestrated, and supervised the entire racketeering scheme at issue.

114. Conspirators' scienter is clearly established from their pattern and practices at issue.

115. Conspirators participated, and conspired with others (including their attorneys and others whose identities are known only to Conspirators at this time) to participate, in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, and all in violation of 18 U.S.C. § 1962(c).

16

116. Conspirator's scheme was to induce MCR to loan money to UCS by offering the exclusive right to collect on UCS's Michigan portfolios.  Conspirators did this knowing that MCR was in the business of collecting debt.  Conspirators made representations to MCR that they had significant portfolios

### 1.  Wire Fraud, Violations of 18 U.S.C. §1343

117. Defendants and the other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, deposited checks and cash into a bank that is part of the interstate banking system.  In all, each check deposited and email sent constitutes a separate occurrences of wire fraud.  Specifically,

A. Each payment sent to University Capital Solutions via wire transfer as discussed above was deposited into a bank in the United States.

B. Defendants have exchanged several email messages to Plaintiffs Kresch/MCR asserting fraudulent representations in furtherance of their scheme:

  i. **February 16, 2012**: Miller's agent emails Plaintiff's controller UCS's Private Placement Memorandum describing UCS's business operations and financial projections along with a link to a video presentation used for marketing to college presidents.

  ii. **February 21, 2012**: Miller's agent also emails Plaintiff's controller stating that states UCS's Account Receivable Management services markets to over 2000 universities and 1200 colleges and are in negotiations with over 400. Additionally, 52 private and public student loan lenders had been contacted through UCS's marketing efforts. He further stated that as a result, UCS is currently purchasing

such portfolios at deep discounts and identified over 4 billion dollars of accounts receivable where 1 billion is potentially eligible. Finally advising that to date it has over 400M booked/under contract for immediate purchase and attached a breakdown of Michigan schools interested in selling UCS delinquent accounts.

iii.   **March 1, 2012:** Miller sends Plaintiff's controller a subscription agreement and addendum outlining the parties' agreement.

iv.   **March 16, 2012**: Miller's agent emails Plaintiff a flowchart for calls received by the NCO Columbus branch, a basic inbound call script, a series of demand letters for soft recovery phase, UCS mapping designators, MCR-GLBA, and representative document of collections reporting from NCO.

v.   **March 21, 2012:** Miller's agent forwards an updated UCS inbound activity report and disposition code for MCR to utilize as a general template and sample activity files of phase one and two accounts.

vi.   **March 22, 2012:** Miller forwards a Collection Servicing Agreement. Miller's agent forwards sample GLBA's along with current NCO collections/recovery work flow and UCS logo.

vii.   **July 7, 2012:** Plaintiff requests a status from Miller's agent on the Michigan portfolios and Miller's agent advises they are "awaiting the final pieces to align."

viii.   **July 13, 2012**: Miller's agent advises Plaintiff he will firm data on new Michigan portfolios in the pipeline.

ix.   **July 18, 2012:** Miller's agent advises Plaintiff that UCS in having a meeting to ensure everything is getting done to expedite the Michigan portfolios.

18

    x.   **October 10, 2012:** Plaintiff emails Miller requesting status of Michigan portfolio promised by Miller to Kresch on their September 27, 2012, meeting. Miller responds that they are checking the status.

    xi.   **October 26, 2012:** Miller emails Plaintiff that he is working on several portfolios but they are not in my ideal states.  He further asserts that the Michigan portfolio hasn't been released and he is also awaiting approval from financing sources to ramp up Michigan and other states.

    xii.   **November 9, 2012**: Miller responds to Plaintiff's email that the portfolio he received (comprised of loans originating from one entity from several hundred schools) that morning was for a $23,000,000 (23 Million) of performing and re-performing private student loans and that bids were due by November 20, 2012. Miller also advised that he hadn't seen the portfolio but heard about it from a manager and believes there are Michigan schools included.

    xiii.   **June 20, 2013**:  Plaintiff requested a status update. Miller replied that he has no access to when a portfolio is released and cites FDCPA and other federal regulations that hold up universities that are still on paper.

**C.** Defendants have exchanged several email messages to Plaintiff John Moleski asserting fraudulent representations in furtherance of their scheme:

    i.   **March 28, 2011**: Don Miller emails Plaintiff a non-disclosure agreement to sign about UCS.

    ii.   **April 14, 2011**: Don Miller emailed Plaintiff thanking him for his interest in University Capital. Don Miller included a consulting agreement as well as the Private Placement Memorandum with this email.

19

iii. **May 4, 2011:** Miller gives Plaintiff information so that Plaintiff's father can invest $50,000 into UCS.

iv. **May 10, 2011:** Miller emailed Plaintiff a personal service agreement outlining that Plaintiff would be hired as an executive and earn $125,000 as an annual salary.

v. **September 21, 2011:** Miller emailed Plaintiff confirming that he deposited $5,000 in cash received from Plaintiff.

vi. **October, 2011:** Miller emailed Plaintiff confirming that the $7,100 Plaintiff provided was deposited.

vii. **November 24, 2012:** Miller emailed Plaintiff confirming that the $5,179.16 Plaintiff provided was deposited.

viii. **January 3, 2012:** Miller emailed Plaintiff confirming Plaintiff's $5,390.29 deposit into UCS.

118. Each participant knew, expected, reasonably foresaw, and intended that the facilities of the wires affecting interstate commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

119. The Conspirators acted willfully and with intent to mislead Plaintiffs in respect to:

    a) UCS already owning and/or looking to purchase Michigan debt portfolios;

    b) Conspirators' intention of paying dividends and using Plaintiffs' money to buy collectable portfolios from educational institutions.

    c) Conspirators' intention of paying dividends to investors.

120. Plaintiffs relied upon Conspirators' representations, and such reliance was reasonable.

121. On dates and times, known only to the Conspirators, Conspirators, in furtherance of the racketeering scheme, deposited checks and cash into the interstate banking system.

122. On dates and time, known only to the Conspirators, Conspirators, in furtherance of the racketeering scheme, used text messaging and electronic mail to communicate with each other over the wires.

123. Each Defendant, acted in concert with to disseminate untrue and misleading information to Plaintiffs.

124. The practice of fraudulently representing UCS' assets, UCS' contacts, and intentions of purchasing debt were intended to defraud Plaintiffs by convincing them that UCS was a reasonable investment opportunity.

125. Communications with Plaintiffs by Defendants after the initial investment were designed by Defendants to lull Plaintiffs in to believing their investments were sound.

126. As a result of these misrepresentations Plaintiff and other members of the Class to invested hundreds of thousands with UCS only for Defendants to place the investments in their bank accounts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, request that this Court award relief as follows:

A. Pursuant to Plaintiff's causes of action, a judgment awarding Plaintiffs as restitution and/or other equitable relief, including, but not limited to, restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs as a result of its unlawful, unfair and fraudulent business practices described herein;

B. Treble damages as allowed under RICO, 18 U.S.C. 1962(c) and (d).

C. A judgment awarding Plaintiffs their costs of suit; including reasonable attorney's fees pursuant to Mich. Comp. Laws Ann. § 600.2405 and as otherwise permitted by statute; and pre and post-judgment interest;

D. Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

*/s/ Keith Altman*

Keith Altman (P81702)
The Law Office Of Keith Altman
Attorney for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI  48033
(248) 291-9702

Dated: January 3, 2018