UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARI KRESCH, MERCHANT'S CREDIT
RECOURSE, LLC, JOHN MOLESKI,
and JESSE MOLESKI,

        Plaintiffs,

                                Civil Case No. 18-10025
v.                            Honorable Linda V. Parker

DONALD MILLER, KYLE ARNESON,
UNIVERSITY CAPITAL SOLUTIONS LLC,
UNIVERSITY CAPITAL INVESTMENTS LLC,
and DOES 1-50,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiffs initiated this lawsuit against Defendants on January 3, 2018. In a First Amended Complaint filed on October 31, 2018, Plaintiffs assert the following claims against Defendants:

(I) breach of contract brought by Plaintiffs Ari Kresch ("Kresch") and Merchant's Credit Recourse, LLC ("MCR");

(II) breach of contract brought by Plaintiff John Moleski ("John");

(III) breach of contract brought by Plaintiff Jesse Moleski ("Jesse");

(IV) fraud brought by John;

(V) fraud brought by Jesse;

(VI) fraud brought by Kresch and MCR;

(VII) negligent misrepresentation brought by all Plaintiffs; and

(VIII) violation of the Racketeer Influenced and Corrupt
Organizations Act ("RICO") brought by Kresch and MCR.

(ECF No. 20.)  The matter is presently before the Court on Defendants' motion to

dismiss, filed pursuant to Rules 12(b)(2) and (6) of the Federal Rules of Civil

Procedure.  (ECF No. 25.)  The motion has been fully briefed.  (ECF Nos. 27, 29.)

Finding the facts and legal arguments sufficiently presented in the parties' briefs,

the Court is dispensing with oral argument with respect to Defendants' motion

pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that

follow, the Court is granting in part and denying in part Defendants' motion to

dismiss.

## I.     Applicable Standards

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal when a court

lacks personal jurisdiction over a defendant.  The plaintiff has the burden of

establishing the Court's jurisdiction over a defendant.  *See Theunissen v.*

*Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *McNutt v. Gen. Motors*

*Acceptance Corp.*, 298 U.S. 178, 189 (1936)).  To defeat a defendant's motion to

dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie

showing of jurisdiction.  *See id*.  A prima facie showing requires the plaintiff to

"'demonstrate facts which support a finding of jurisdiction. . ..'"  *Welsh v. Gibbs*,

631 F.2d 436, 438 (6th Cir. 1980) (quoting *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).  Where the court does not hold an evidentiary hearing on the matter, "the court must consider the pleadings and affidavits in a light most favorable to the plaintiff."  *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they

are referred to in the [c]omplaint and are central to the claims contained therein."

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## II.    Factual Background

Kresch is currently a citizen of San Juan, Puerto Rico, but was a Michigan citizen during the events that give rise to this lawsuit.  (Am. Compl. ¶ 1.)  Kresch is the manager of MCR, which is in the business of collecting on Michigan debt portfolios.  (*Id.* ¶¶ 1, 2.)  John is a Florida resident who was employed by Defendant University Capital Solutions ("UCS") to perform debt collection projections.  (*Id.* ¶ 3.)  Jesse, John's father, is a New York resident.  (*Id.* ¶ 4.)

UCS is a Florida limited liability corporation that allegedly purchased private student loan debt generated by universities for debt collection.  (*Id.* ¶ 8.)  Defendant Donald Miller ("Miller") is a Florida resident and the co-founder and manager of UCS.  (*Id.* ¶ 5.)  Defendant Kyle Arneson ("Arneson") is a resident of Illinois and was the Vice President of Capital Formation for UCS.  (*Id*. ¶ 6.)  Defendant University Capital Investments, LLC ("UCI") is a Florida corporation, apparently connected with UCS.  (*Id*. ¶ 7.)  Plaintiffs allege that there was a unity of interest between Defendants such that they are alter egos of one another.  (*Id.* ¶¶ 10-12.)

On February 16, 2012, Defendants approached Kresch and MCR offering them the opportunity to purchase student loan debt that Defendants claimed would

fit the investing criterion of MCR's debt buying business.  (*Id*. ¶ 21.)  Defendants

represented that UCS purchases private student loan debt generated by universities

at a discount and then collects on that debt.  (*Id*. ¶ 22.)  In subsequent

conversations with Kresch and MCR, Defendants further represented that UCS

already owned a significant amount of "student gap debt," including Michigan

schools for MCR to collect.  (*Id*. ¶ 23.)  Defendants supplied Kresch and MCR

with materials describing UCS' business operations and financial projections and a

link to a video presentation used for marketing to college presidents.  (*Id*. ¶ 24.)

On February 21, 2012, Defendants represented *inter alia* that UCS markets to over

2,000 universities and 1,200 colleges, and had over $400 million worth of

portfolios booked and/or under contract for immediate purchase.  (*Id*. ¶ 26.)

Defendants provided a breakdown of the Michigan schools interested in selling

UCS their delinquent accounts.  (*Id*. ¶ 27.)

 Based on Defendants' representations, Kresch and MCR entered into a note

purchase agreement with UCS on March 7, 2012.  (*Id*. ¶ 28, citing Ex. A.)  MCR

wired $500,000 to Defendants on March 14, 2012, in accordance with the

agreement.  (*Id*.)  As part of the note purchase agreement, MCR was provided a

Senior Corporate Debenture ("Debenture").  (*Id*. ¶ 29.)  Pursuant to the Debenture,

MCR was to be repaid its $500,000 investment plus 12% interest on March 7,

2013.  (*Id.*)  Although UCS had the right to extend its repayment obligation by one year, it did not request such an extension.  (*Id.*)  UCS failed to pay the amount due.

MCR also entered into a "Collection Servicing Agreement" with UCI on May 23, 2012.  (*Id.* ¶ 30, Ex. B.)  Pursuant to the Collection Servicing Agreement, UCI appointed MCR to be its exclusive servicer in Michigan in exchange for MCR's $500,000 investment in UCS.  (*See id.* Ex. B § 2.01.)  The Collection Servicing Agreement required MCR to make additional investments in UCS upon receiving a specified amount of fees from accounts and other assets collected on behalf of UCS and/or UCI.  (*Id.*)

For a period of time, Kresch and MCR asked Defendants to identify the Michigan debt portfolios UCS acquired and that MCR would be receiving for collection.  (Am. Compl. ¶ 31.)  MCR in fact never received a single Michigan debt portfolio from Defendants and discovered in 2014 that USC never acquired any Michigan portfolios.  (*Id.* ¶ 32.)  In fact, MCR learned that UCS had no personal contacts with college and university presidents in Michigan and never intended to buy any debt portfolios from Michigan.  (*Id.* ¶¶ 32, 33.)  MCR also learned that the amount it paid Defendants had been deposited into Miller's and Arneson's personal bank accounts.  (*Id.* ¶ 34.)

John was introduced to Defendants in 2011, and agreed to work for Miller in April 2011.  (*Id.* ¶¶ 36-37.)  Based on Defendants' representations concerning

UCS, John invested $85,960.39 into the corporation. (*Id*. ¶ 39.) John witnessed Defendants raise at least $1.1 million in investments for UCS. (*Id*. ¶ 41.) According to John, UCS spent $40,000, at most, to purchase debt portfolios; although, John came into contact with many colleges and universities while working with Defendants that were ready and willing to sell UCS student loan debt portfolios. (*Id*. ¶¶ 42, 43.)

Jesse also invested in UCS after his son, John, shared the representations Miller made about the corporation with him. (*Id*. ¶ 48.) On May 5, 2011, Jesse signed a subscription agreement and wired $60,5000 to UCS. (*Id*. ¶¶ 50, 51; Defs.' Mot. Ex. 1.)

## III. Defendants' Arguments & Analysis

### A. Claims by John and Jesse

Defendants argue that this Court lacks personal jurisdiction over them with respect to John's and Jesse's claims because Defendants lack sufficient ties to Michigan to exercise general jurisdiction over them and the alleged conduct on which the claims are based has no connection with Michigan. Plaintiffs did not respond to Defendants' arguments in their response brief. As such, Plaintiffs have

not satisfied their burden of showing that this Court has personal jurisdiction over John's and Jesse's claims.[1]

The Court therefore is dismissing without prejudice the claims asserted by John and Jesse in the First Amended Complaint (Counts II through IV in their entirety and Count VII in part).

### B. Breach of Contract Claim by MCR & Kresch (Count I)

In their motion, Defendants assert several arguments for why the breach of contract claim brought by MCR and Kresch should be dismissed:

(a) Kresch and Miller were not parties to the note purchase agreement or Collection Servicing Agreement and therefore are not proper parties to a claim asserting the breach of either agreement;

(b) The claim, to the extent based on the Collection Servicing Agreement, is time-barred under the applicable five-year limitations period, Fla. Stat. § 95.11(2)(b);

(c) Plaintiffs fail to identify a specific term of the Collection Servicing Agreement that was breached; and,

(d) The claim, to the extent based on the note purchase agreement, is subject to arbitration.

---

[1] There are no allegations in Plaintiffs' First Amended Complaint suggesting that Defendants have sufficient contacts with Michigan to exercise general jurisdiction or that the breach of contract claims brought by Jesse or John "derive[] from" or are "connected with" this jurisdiction. *See Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (finding a lack of personal jurisdiction with respect to non-resident plaintiffs' claims against the defendant even though the court had jurisdiction with respect to similar claims brought by resident plaintiffs).

(ECF No. 25.)  The Collection Servicing Agreement, note purchase agreement, and Senior Corporate Debenture contain choice of law provisions, stating that Florida law governs.  (Pls.' Am. Compl. Ex. A ¶ 23, ECF No. 20-1 at Pg ID 335; *Id.* Ex. B § 7.05(a), ECF No. 20-2 at Pg ID 358; Defs.' Mot. Ex. 2 ¶ 10, ECF No. 25-2 at Pg ID 591.)

### 1.    Arbitration

Defendants contend that Kresch and MCR's breach of contract claim, to the extent based on the note purchase agreement, is subject to arbitration.  In support of this argument, Defendants quote the language of an arbitration provision, which they claim is contained in the Private Placement Memorandum attached to their motion.  (Defs.' Br. in Supp. of Mot. at 9, citing Ex. 3, ECF No. 25-3.)

The arbitration provision, however, is not in the Private Placement Memorandum itself.[2]  Rather, it is found in the sample Subscription Agreement

---

[2] Kresch and MCR's breach of contract claim, to the extent premised on the failure of Defendants' to repay the $500,000 loan plus 12% interest, arises from the note purchase agreement *and* Senior Corporate Debenture as only the latter states the terms of the loan.  For purposes of deciding Defendants' motion to dismiss, the Court is assuming that the Senior Corporate Debenture, which incorporates the Private Placement Memorandum, also incorporates or is incorporated within the note purchase agreement, although not expressly stated in any of the documents and despite the fact that the note purchase agreement contains a clause stating that "[t]his Agreement constitutes the entire Agreement among the parties with respect to the subject matter hereof and may be amended only by a written instrument executed by all of the parties." (*See* Am. Compl. Ex. A ¶ 23, ECF No. 20-1 at Pg ID 334.)  The Debenture expressly incorporates the terms and conditions of the **(Cont'd . . .)**

Form attached as an exhibit to the memorandum. (*See* Defs.' Mot. Ex. 3 Ex. A, ECF No. 25-3 at Pg ID 677-85.) That Subscription Agreement Form requires the signature of the parties. Defendants have not presented the Court with a copy of that Subscription Agreement Form—or any agreement containing an arbitration provision—signed by MCR or Kresch. While the Senior Corporate Debenture signed by MCR incorporates the terms and conditions of the Private Placement Memorandum (*see* Defs.' Mot. Ex. 2 at 1, ECF No. 25-2 at Pg ID 589), the Debenture does not contain an arbitration provision and provides for exclusive jurisdiction in "the Circuit Court serving Palm Beach County, Florida in connection with *any* dispute arising under th[e] Debenture …." (*Id.* ¶ 10, ECF No. 25-2 at Pg ID 591-92, emphasis added.) Further, the Debenture provides: "In the event of any inconsistencies between this Debenture and such documents [i.e. all documents annexed thereto and referenced therein], the Debenture shall govern." (*Id.* ¶ 8, ECF No. 25-2 at Pg ID 591.)

The Court therefore is not convinced that Kresch and MCR's breach of contract claim is subject to arbitration.

### 2. Non-Parties to Agreements

---

Private Placement Memorandum, however. (Defs.' Mot. Ex. 2 at 1, ECF No. 25-2 at Pg ID 589.)

Miller is not a party to the Collection Servicing Agreement or the note purchase agreement. Plaintiffs allege, however, that he is liable for breach of contract under an alter ego theory or because UCS and UCI were established for fraudulent purposes. (Am. Compl. ¶¶ 10-12.) Florida law allows the corporate veil to be pierced to hold an individual personally liable where the corporation is merely the alter ego of the individual or is shown to have been organized or used to perpetrate a fraud. *See, e.g., Raymond, James & Assoc., Inc. v. Zumstorchen Inv., Ltd.*, 488 So.2d 843, 846 (Fla. Dist. Ct. App. 1986) (citing cases). The Court finds Plaintiffs' allegations sufficient to make this showing for purposes of Defendants' Rule 12(b)(6) motion.

### 3.    Terms of Collection Servicing Agreement Breached

Defendants argue that Kresch and MCR's breach of contract claim fails, to the extent it is based on the Collection Servicing Agreement, because Plaintiffs' First Amended Complaint does not identify any contractual term within that agreement that was breached.

To state a claim for breach of contract under Florida law, the plaintiff must "plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008)). Kresch and MCR allege that Defendants

breached the Collection Servicing Agreement by failing to provide Michigan loan portfolios for MCR to collect and that Kresch and MCR were damaged "because they did not earn profits from collections of delinquent loans …." (Am. Compl. ¶¶ 79, 80, ECF No. 20 at Pg ID 317.) While UCI promised in the Collection Servicing Agreement to make MCR its exclusive servicer in Michigan, nothing within the agreement required UCI to acquire any Michigan loans.[3] As Plaintiffs acknowledge in their response brief, a contract that is not mutually enforceable is illusory. (*See* Pls.' Resp. Br. at 10-11, ECF No. 27 at Pg ID 722-23, citing Michigan law); *see also Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So.2d 4, 5 (Fla. 1984) (citations omitted) ("Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound.").

Plaintiffs nevertheless argue that every contract contains an implied covenant of good faith and fair dealing. (Pls.' Resp. Br. at 12, ECF No. 27 at Pg ID 724.); *see also QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So.3d 541, 548 (Fla. 2012) (citing cases) ("Florida contract law does recognize an implied covenant of good faith and fair dealing in every contract."). However, "[a] duty of good faith must 'relate to the performance of an express term of the

---

[3] As such, the agreement does not promise a date by which UCI or UCS would purchase Michigan loans for collection or specify the number of loans UCI or UCS would acquire.

contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.'" *Id.* (quoting *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So.2d 1232, 1234 (Fla. Dist. Ct. App. 2001)) (additional quotation marks and citation omitted). The Collection Servicing Agreement does not require Defendants to secure *any* Michigan loans for collection. The implied duty of good faith cannot be used to impose terms to which the parties never agreed. *See Beach Street Bikes, Inc. v. Bourgetts' Bike Works, Inc.*, 900 So.2d 697, 700 (Fla. Dist. Ct. App. 2005) (quoting *Ins. Concepts & Design*, 785 So.2d at 1235).

Plaintiffs argue that if Defendants had no obligation to secure any Michigan portfolios, the Collection Servicing Agreement fails for want of consideration and Kresch and MCR are entitled to a return of the $500,000 they invested on an unjust enrichment theory. (Pls.' Resp. Br. at 10-11, ECF No. 27 at Pg ID 722-23.) The $500,000 Kresch and MCR paid, however, constituted an investment in UCS for which they also received a promise from UCS to be repaid the full amount plus interest (12%) by March 7, 2013. (*See* Am. Compl. Ex. B § 2.01(2)(a), ECF No. 20-2 at Pg ID 344; Defs.' Mot. Ex. 2 at 1, ECF No. 25-2 at Pg ID 589.) Under Florida or Michigan law, an unjust enrichment claim is precluded when adequate legal remedies, such as a claim for breach of contract, exist. Kresch and MCR

have an adequate legal remedy to seek the $500,000—that is, through their breach of contract claim based on the note purchase agreement.

For the reasons stated, the Court concludes that MCR and Kresch fail to state a viable breach of contract claim against Defendants based on the Collection Servicing Agreement.[4]  The Court, therefore, is dismissing Count I of the First Amended Complaint *to the extent based upon the Collection Servicing Agreement*.

### C.  Fraud Claims by MCR and Kresch (Counts VI and VII)

In their fraud claims, Kresch and MCR allege that Defendants knowingly or negligently misrepresented that UCS already owned and/or was looking to purchase Michigan debt portfolios and would use the money Plaintiffs invested in UCS to purchase such portfolios.  (*See, e.g.*, Am. Compl. ¶ 118, ECF No. 20 at Pg ID 321.)  Plaintiffs indicate that Defendants made these representations starting on February 16, 2012, and shortly thereafter, culminating in Kresch and MCR, in reliance, entering into the note purchase agreement with UCS on March 7, 2012. (*Id.* ¶¶ 21-28, 122, Pg ID 310-11, 321.)  According to Plaintiffs, Defendants knew these representations were false when made, never intending to buy any debt portfolios from Michigan.  (*Id.* ¶ 120, Pg ID 321.)

---

[4] The Court therefore finds it unnecessary to address Defendants' statute of limitations argument as it is directed only to the claim, to the extent based on the Collection Servicing Agreement.
**(Cont'd . . .)**

Under Florida law,[5] a plaintiff claiming fraud must show: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Golden v. Mobil Oil Corp.*, 882 F.2d 490, 494 (11th Cir. 1989) (citing *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985)).

### 1.    Rule 9(b) of the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 9(b) imposes heightened pleading requirements on a party alleging fraud. The Sixth Circuit has interpreted the rule as requiring a plaintiff to "'allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *Yuhasz v.*

---

[5] Defendants contend that Florida law applies to all of Plaintiffs' claims. Plaintiffs do not challenge this assertion in their response brief, except with respect to Kresch and MCR's breach of contract claim (for which they contend that Michigan law applies but only if the contract fails for want of consideration). Plaintiffs cite Florida and Michigan law interchangeably in their response brief, but they make no argument for why Michigan law applies. It is not evident that there is a conflict between Florida and Michigan law, except with respect to the limitations periods applicable to Plaintiffs' claims. In any event, given the Florida choice of law provision in the contracts at issue and that the distinction between Plaintiffs' breach of contract and fraud claims are very slight, the Court is inclined to find that Florida law applies and therefore will cite exclusively to Florida law. *See Watkins & Sons Pet Supplies v. IAMS Co.*, 254 F.3d 607, 611 (6th Cir. 2001).

*Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)) (additional quotation marks and citation omitted).  "[A]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Id.* (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).  Nevertheless, the Sixth Circuit has stated that "when deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8." *Id.*  That is because "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8[.]" *Id.* (quotation marks and citation omitted).

Plaintiffs' factual allegations are sufficient to satisfy Rule 9(b)'s particularity requirement.  While Plaintiffs do refer to Defendants at times in their First Amended Complaint in the aggregate, UCS and UCI only speak through Miller and Arneson and Plaintiffs allege that Defendants conspired together to engage in fraud.  Moreover, "absolute precision is not necessarily needed" and the rule's requirements "can be relaxed so long as the complaint provides the defendant with sufficient notice [to] answer and defend the claim." *Woodland Harvesting, Inc. v. Georgia Pacific Corp.*, 693 F. Supp. 2d 732, 739 (E.D. Mich. 2010); *see also Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) ("The threshold test is

whether the complaint places the defendant on sufficient notice of the misrepresentation, allowing the defendants to answer, addressing in an informed way [the] plaintiffs['] claim of fraud.") (internal quotation marks and citation omitted). Plaintiffs' allegations satisfy this test. Defendants' understanding of Kresch and MCR's fraud claims is evident from Defendants' motion to dismiss.

### 2. Future Promises

Defendants contend that Kresch and MCR's fraud claims fail because they are predicated on promises of future action. "An Action for fraud generally may not be predicated on statements of opinion or promises of future action, but rather must be based on a statement concerning a past or existing fact." *Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. Dist. Ct. App. 2001) (citations omitted). As this same case states, however, promises of future action may be actionable "if the plaintiff can demonstrate that the person promising future action does so with no intention of performing or with a positive intention not to perform …." *Id.* (citations omitted); *see also Cafaro v. Zois*, 693 F. App'x 810, 816 (11th Cir. 2017) (citing *Prieto v. Smook, Inc.*, 97 So.3d 916, 917-18 (Fla. Dist. Ct. App. 2012)). To the extent Kresch and MCR's fraud claims are based on promises of future action,[6]

---

[6] Kresch and MCR's fraud claims also appear to be based on Defendants' representations that UCS already owned Michigan debt or was in the process of negotiating the purchase of debt from Michigan schools. (*See, e.g.*, Pls.' Am. Compl. ¶¶ 23, 27, ECF No. 20 at Pg ID 311.)

they sufficiently allege that Defendants promised future action with the present intent not to perform.  (*See* Am. Compl. ¶¶ 33, 120, ECF No. 20 at Pg ID 312, 322.)

### 3.    Non-Reliance Clauses

Defendants argue that the fraud claims brought by MCR and Kresch are barred by the non-reliance clauses in the note purchase agreement and Private Placement Memorandum.

Panels of Florida's District Court of Appeal disagree on whether a non-reliance clause negates a claim for fraud.  *Compare Billington v. Ginn-La Pine Island, Ltd.*, 192 So.3d 77, 84 (Fla. Dist. Ct. App. 2016) ("[W]e hold that the 'non-reliance' clauses in this case negate a claim for fraud in the inducement because Appellant cannot recant his contractual promises that he did not rely upon extrinsic representations."), *with Lower Fees, Inc. v. Bankrate, Inc.*, 74 So.3d 517, 520 (Fla. Dist. Ct. App. 2011) (holding that a non-reliance disclaimer was insufficient to defeat a claim for fraud in the inducement because "[i]t has been the law of this state for some time that a claim of fraud in the inducement will not be defeated by contract clauses"); *see also Adrianne Roggenbuck Trust v. Dev. Res. Grp., LLC*, 505 F. App'x 857, 861 (11th Cir. 2013) (acknowledging an evident split of

authority among the Florida courts on the effect of merger clauses).[7]  Nevertheless, the Florida Supreme Court has held that "a party can not [sic] contract against liability for his own fraud."  *Oceanic Villas, Inc. v. Godson*, 4 So.2d 689, 690 (Fla. 1941).  In a recent decision, the Eleventh Circuit Court of Appeals concluded that it was required to apply this express holding because the Florida Supreme Court had not overruled its decision.  *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027 (11th Cir. 2017).  Similarly, the Sixth Circuit Court of Appeals, interpreting Florida law, has concluded that such clauses do not prohibit a party from bringing a fraud claim, but are evidence relevant to whether the party reasonably relied on the representations that form the claim.  *Beeper Vibes, Inc. v. Simon Prop. Grp., Inc.*, 600 F. App'x 314, 318-19 (2014).  In *Beeper Vibes*, the court held that it was unreasonable as a matter of law for the plaintiff to rely on the defendant's representations where their integrated written agreement did not contain the same promise.  *Id*. at 319.

MCR and Kresch allege that Defendants falsely represented two things: (a) that UCS already owned and/or was looking to purchase Michigan loan portfolios; and, (b) that UCS intended to use their $500,000 investment to purchase loan

---

[7] In *Billington*, Florida's District Court of Appeal recognized the conflict in its holdings.  192 So.3d at 82-83.  The court therefore certified several questions to the Florida Supreme Court concerning non-reliance and similar clauses.  *Id*. at 85. The parties in *Billington* did not pursue the issue in the Florida Supreme Court and the Court has not otherwise decided to address the questions presented.

portfolios.  Defendants do not point to express, specific, and unambiguous language in any of the relevant agreements negating these alleged representations. *See Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1315 (M.D. Fla. 2017) (quoting *Le Macaron, LLC v. Le Macaron Dev. LLC*, No. 8:16-cv-918, 2016 WL 6211718, at *4 (M.D. Fla. Oct. 24, 2016)) ("The one thing Florida courts do agree on regarding non-reliance clauses is that they must be 'sufficiently express, specific, and unambiguous with respect to the representation at issue.'").  Nor do Defendants articulate why it was unreasonable for Plaintiffs to rely on these representations, except to quote the following: "'[I]t is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties.'"  (Defs.' Reply Br. at 6, ECF No. 29 at Pg ID 746, quoting *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999) (quoting *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996)).)  However, in *Barnes* and *Eclipse Medical* and many of the additional cases containing the same language, express terms of the parties' contracts contradicted the representations on which the plaintiffs' fraud claims were based.  Absent express contradictory terms, a court must consider the circumstances as a whole to determine the

reasonableness of the plaintiff's reliance and whether that reasonableness can be decided as a matter of law.

The Court is unable to assess the reasonableness of MCR and Kresch's reliance on Defendants' alleged misrepresentations based on the allegations in the First Amended Complaint. The Court cannot conclude that MCR and Kresch's fraud claims are barred by the non-reliance or cautionary terms of the note purchase agreement.

### 4. Statute of Limitations

Under Florida law, an action for fraud generally must be brought within four years. Fla. Stat. § 95.11(3)(j). This period of time begins to run "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." *Id.* § 95.031(2); *see also First Fed. Savings & Loan Ass'n of Wisconsin v. Dade Fed. Savings & Loan Ass'n*, 403 So.2d 1097, 1100 (Fla. Dist. Ct. App. 1981). Until the plaintiff discovers or should have discovered that the defendant's representations were false, the limitations period does not start to run. *See Steinmetz v. G.D. Parker Sod, Inc.*, 673 So.2d 968, 968 (Fla. Dist. Ct. App. 1996) (quoting Fla. Stat. § 95.031(1)) (holding that the statute of limitations for fraud accrued when the plaintiff acquired knowledge that the defendant's representations were false as "[t]he cause of action accrues 'when the last element constituting the cause of action occurs.'").

Defendants argue that MCR and Kresch's fraud claims are time-barred because they were brought nearly five and a half years after the February and July 2012 dates alleged in the First Amended Complaint for when the misrepresentations regarding UCS' loan portfolios were made and when Kresch and MCR "made various inquiries regarding those representations." (Defs.' Br. in Supp. of Mot. at 19, citing Am. Compl. ¶¶ 49, 108, 141, ECF No. 25 at Pg ID 564.) When the misrepresentations were made and when MCR or Kresch discovered the elements of their fraud claims are two different things, however. Defendants do not identify a date when Kresch or MCR knew or should have discovered the falsity with respect to the alleged representations (those being, the extent of UCS' Michigan loan portfolios and Defendants' use of Plaintiffs' $500,000 investment). This information is not evident within the four corners of Plaintiffs' First Amended Complaint.

The Court therefore cannot conclude at this time that Kresch and MCR's fraud claims are time-barred.

### 5. Arbitration

Defendants lastly argue that the fraud claims must be dismissed because they are subject to arbitration. The Court rejects Defendants' argument for the reasons discussed above with respect to Kresch and MCR's breach of contract claim.

### D. RICO Claim (Count VIII)

MCR and Kresch assert a RICO claim against Defendants. Defendants argue that the claim is barred by the Private Securities Litigation Reform Act ("PSLRA") or the applicable statute of limitations or is subject to arbitration.

The civil RICO statute, 18 U.S.C. § 1964(c), creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962." "[B]y reason of" means the injury must be proximately caused by the RICO violation. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992). To prove their RICO claim, Kresch and MCR must show the following: "1) that there were two or more predicate offenses; 2) that an 'enterprise' existed; 3) that there was a nexus between the pattern of racketeering activity and the enterprise; and 4) that an injury to business or property occurred as a result of the above three factors." *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993)). Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. § 1961(1)(B). Defendants focus on whether the First Amended Complaint alleges a "pattern of racketeering."

To establish a pattern of racketeering activity, Kresch and MCR must show that Defendants committed at least two predicate racketeering acts within ten years of each other that demonstrate criminal conduct of a continuing nature. 18 U.S.C. § 1961(5). The racketeering predicates must be "related" and "amount to or pose a

threat of continued criminal activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)).

Predicate acts are related if they have "'similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240). The continuity requirement "can be satisfied by showing either a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that pose a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)." *Heinrich*, 668 F.3d at 409-10 (citing *H.J. Inc.*, 492 U.S. at 241-42). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement …." *H.J. Inc.*, 492 U.S. at 242.

Kresch and MCR identify wire fraud, 18 U.S.C. § 1343, as Defendants' racketeering activity. (Am. Compl. ¶¶ 141-150, ECF No. 20 at Pg ID 326-28.) Wire fraud consists of a scheme to defraud and use of the wires in furtherance of the scheme. *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003); *see also* 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false

or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representation, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005).

Kresch and MCR define Defendants' scheme differently at varying points in the First Amended Complaint. Initially in their RICO claim, Kresch and MCR assert that Defendants' "scheme was to induce MCR to loan money to UCS by offering the exclusive right to collect on UCS's Michigan portfolios." (Am. Compl. ¶ 140, ECF No. 20 at Pg ID 324.) Consistent with that assertion, addressing Defendants' PSLRA argument in their response brief, Plaintiffs state that Kresch and MCR rely only "upon the Collection Servicing Agreement as the basis for the[ir] RICO claims." (Pls.' Resp. Br. at 18, ECF No. 27 at Pg ID 730.) According to the First Amended Complaint, to further this scheme, Defendants sent emails to MCR between February 16, 2012, and June 20, 2013, making representations and attaching materials that falsely represented UCS' activities and efforts to secure Michigan loan portfolios. (Am. Compl. ¶¶ 141.B, ECF No. 20 at Pg ID 324-26.)

However, the First Amended Complaint also lists representations Defendants made to John Moleski to demonstrate a pattern of racketeering activity. (*Id.* ¶¶ 141.C, Pg ID 326-27.) It further alleges more broadly that Defendants' scheme was to induce Plaintiffs, collectively, to invest in UCS, by fraudulently representing UCS' existing and prospective Michigan debt portfolios and its intention of paying dividends and using Plaintiffs' investments to buy portfolios. (*Id.* ¶ 143, Pg ID 327.) And in response to Defendants' motion, Plaintiffs state that Defendants' "activities involve one scheme: to defraud investors and business partners out of money by convincing them that Defendants had and would further acquire delinquent student debt." (Pls.' Resp. Br. at 18, ECF No. 27 at Pg ID 730.)

### 1.     PSLRA

The Third Circuit Court of Appeals has aptly described the interaction between the federal RICO statute, 18 U.S.C. § 1962(c), and the PSLRA, 18 U.S.C. § 1964(c):

> Prior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in "garden variety" fraud. Inasmuch as "fraud in the sale of securities" was a predicate offense in both criminal and civil RICO actions, plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages. However, in 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995). The PSLRA amended RICO by narrowing the kind of conduct that could qualify as a predicate act. Section 107 of the PSLRA (known as the "RICO Amendment") amended 18 U.S.C. § 1964(c), to provide in relevant part as follows:

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962*." 18 U.S.C. § 1964(c)(emphasis added).

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (internal citations omitted). "The amendment not only eliminates securities fraud as a predicate act in civil RICO claims, but also prevents plaintiffs from relying on other predicate acts if they are based on conduct that would have been actionable as securities fraud." *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 790 (6th Cir. 2012) (citing *Bald Eagle Area Sch. Dist.*, 189 F.3d at 330). Thus, the question this Court must resolve is whether Kresch and MCR's RICO claim relies on conduct that would have been actionable as fraud in the purchase or sale of securities.

Defendants make no attempt to explain how the conduct alleged in the First Amended Complaint would be actionable as fraud in the purchase or sale of securities. Defendants do not identify the security purchased by MCR and/or Kresch and sold by Defendants. The Court will not make Defendants' arguments for them and therefore declines to find that Kresch and MCR's RICO claim is barred by the PLSRA.

### 2. Statute of Limitations

The statute of limitations for a federal RICO action is four years. *Rotella v. Wood*, 528 U.S. 549, 552 (2000) (citing *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 156 (1987)). The limitations period begins to run when the plaintiff knew or should have known of his injury. *Id.* at 554-55. Accrual of the plaintiff's action is not delayed until he or she discovers the alleged pattern of racketeering activity. *Id.* at 554 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

To the extent Kresch and MCR's RICO claim is premised only on the Collection Servicing Agreement and MCR's exclusive right to collect UCS's Michigan portfolios in exchange for its $500,000 investment, the Court cannot conclude at this juncture that the claim is time-barred. As stated previously with respect to Kresch and MCR's fraud claim, it is not evident when they knew or should have known that UCS had no Michigan debt portfolios and never intended to purchase those portfolios.

To the extent, however, that MCR and Kresch are premising their RICO claim on a scheme to attract investments in UCS with the promise of repayment at 12% interest, the claim is time-barred. Pursuant to the Debentures, UCS was obligated to repay investors within one year (March 7, 2013, with respect to Kresch and MCR). (*See* Defs.' Mot. Ex. 2 at 1, ECF No. 25-2 at Pg ID 589.) While UCS had the right to extend the due date for an additional year, the First

Amended Complaint expressly provides that UCS did not exercise that right.  (*See* Am. Compl. ¶ 29, ECF No. 20 at Pg ID 312.)  Therefore, UCS' investors were injured, and should have known that they were injured, as of March 7, 2013.  MCR and Kresch did not file this action until January 3, 2013—more than four years later.

### 3.  **Pattern of Racketeering Activity**

While Kresch and MCR's RICO claim is not time-barred to the extent it is based on the Collection Servicing Agreement, it does fail because the allegations in the First Amended Complaint do not establish a pattern of racketeering activity related to that scheme.

First, with respect to open-ended continuity, the alleged facts do not suggest a threat of continuing criminal conduct beyond the period in which the identified predicate acts were performed.  Contrary to Defendants' assertion, the fact that UCS and UCI were dissolved in 2012 does not negate a finding of open-ended continuity.  *See Heinrich*, 668 F.3d at 410 (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)) (finding that continuity could be established even though the defendant was shut down as part of a criminal prosecution because "[s]ubsequent events are irrelevant to the continuity determination[]" and "the threat of continuity must be viewed at the time the racketeering activity occurred."); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 729 (6th Cir.

2006) (Moore, J., concurring) (stating that the court should not consider events that transpired after the alleged racketeering acts ended when determining whether a threat of long-term racketeering activity has been properly alleged). Nevertheless, there are no facts alleged suggesting that Defendants obtained money from any other individual or entity by promising an exclusive servicer agreement. The Collection Servicing Agreement appears to be a unique contract between MCR and UCS. Moreover, the scheme had a "built-in endpoint"—that is, MCR made a one-time payment to become UCS' exclusive servicer in Michigan. The facts do not suggest a "specific threat of repetition extending indefinitely into the future[.]" *H.J. Inc.*, 492 U.S. at 242.

Second, turning to closed-ended continuity, the alleged predicates did not extend over a substantial period of time. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* Plaintiffs describe predicate acts allegedly committed over (at most) a sixteen-month period,[8] which were part of a single fraudulent scheme to

---

[8] The Court is not convinced that all of the conduct alleged by Plaintiffs qualify as predicate acts under RICO. In other words, some of the conduct is not related to the scheme defined by Plaintiffs—that is, "to induce MCR to loan money to UCS by offering the exclusive right to collect on UCS' Michigan portfolios." For example, Defendants misrepresentations in an effort to conceal the truth about UCS' portfolios *after* the Collection Servicing Agreement was executed and MCR paid UCS $500,000 did not threaten continued criminal conduct but attempted to hide Defendants' alleged previous fraud.

misrepresent UCS' ownership and/or interest in purchasing Michigan debt portfolios to encourage MCR and Kresch to invest $500,000 in UCS. This is insufficient to establish a closed-ended period of continuity. *See Moon*, 465 F.3d at 725-26 (predicate acts lasting for two-and-a-half years did not establish a closed period of continuity where they were "keyed to [the d]efendants' single objective of depriving [the plaintiff] of his [workers' compensation] benefits"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134-35 (6th Cir. 1994) (concluding that alleged predicate acts failed to establish a closed-ended period of racketeering activity where there was a single fraudulent scheme to misrepresent a guaranteed price and then extort a higher price, the total scheme lasted only seventeen months, and the goal of the single criminal episode was "to get [the plaintiff] to pay the cost of one paint system").

For these reasons, the Court concludes that MCR and Kresch's RICO claim must be dismissed.

## IV.    Conclusion

In summary, the Court is **GRANTING IN PART AND DENYING IN PART** Defendants' motion to dismiss (ECF No. 25). The Court is dismissing without prejudice John Moleski's and Jesse Moleski's claims against Defendants for lack of personal jurisdiction. As such, **Counts II-V in their entirety and Count VII to the extent asserted by John and Jesse Moleski** are **DISMISSED**

**WITHOUT PREJUDICE** and these plaintiffs are **DISMISSED AS PARTIES** to this lawsuit. The Court concludes that Kresch and MCR fail to plead a viable breach of contract claim to the extent the claim is premised on the Collection Servicing Agreement because they do not identify a specific contract term breached by Defendants. Count I is therefore **DISMISSED WITH PREJUDICE to the extent premised on the Collection Servicing Agreement**. MCR and Kresch's breach of contract claim based on the Debenture survives Defendants' motion to dismiss, although their fraud claim to the extent premised on the Debenture is time-barred. MCR and Kresch's fraud claim based on the Collection Servicing Agreement survives Defendants' motion. However, their RICO claim (Count VIII) is **DISMISSED WITH PREJUDICE**.

       **IT IS SO ORDERED**.

                    s/ Linda V. Parker
                    LINDA V. PARKER
                    U.S. DISTRICT JUDGE

Dated: July 29, 2019