UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARI KRESCH, et al.,

          Plaintiffs,

                                      Civil Case No. 18-10025
v.                                  Honorable Linda V. Parker

DONALD MILLER, et al.
,

          Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter remains before the Court on claims brought by Plaintiffs Ari Kresch and Merchant's Credit Recourse ("MCR") (collectively "Plaintiffs") against Defendants Donald Miller and University Capital Solutions LLC ("UCS") (collectively "Defendants") for fraud and breach of contract. Plaintiffs also allege that UCS is an alter ego of Miller. Defendants have filed a motion for summary judgment (ECF No. 47), which has been fully briefed (ECF Nos. 49, 50, 51). Finding the facts and legal issues adequately presented in the parties' filings, the Court is dispensing with oral argument with respect to Defendants' motion pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden

of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence

upon which a jury could reasonably find for that party; a "scintilla of evidence" is

insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the

non-movant's evidence and draw "all justifiable inferences" in the non-movant's

favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must

designate specifically the materials in the record supporting the assertion,

"including depositions, documents, electronically stored information, affidavits or

declarations, stipulations, admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1).  Notably, the trial court is not required to construct a

party's argument from the record or search out facts from the record supporting

those arguments.  *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80

(6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to

establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc.*

*v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v.*

*Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990)

("A district court is not required to speculate on which portion of the record the

nonmoving party relies, nor is it obligated to wade through and search the entire

record for some specific facts that might support the nonmoving party's claim.").

The parties are required to designate with specificity the portions of the record

such that the court can "readily identify the facts upon which the . . . party

relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## II.     Factual Background

Kresch is the sole shareholder of MCR, which is a collection agency for

delinquent debt portfolios.  (Kresch Decl. ¶¶ 4, 5, ECF No. 49-1 at Pg ID 1219-

20.)  UCS is a now-dissolved Florida limited liability corporation which purchased

distressed consumer debt with a focus on distressed accounts receivables held by

universities and colleges throughout the United States.  (*See* Defs.' Mot. Ex. 3,

ECF No.47-3 at Pg ID 1153.)  Miller was the President and Chief Executive

Officer of UCS, as well as one of its shareholders.  (Miller Decl. ¶¶ 3, 4, ECF No.

47-1 at Pg ID 1119.)

According to Miller, since its inception in 2009, UCS adhered to the

formalities of a Florida limited liability company, with its own officers and

managers, corporate records, meetings, headquarters, and bank accounts.  (*Id.* ¶ 6,

Pg ID 1119.)  UCS was treated as a separate and distinct legal entity from its

shareholders and did not allow them to siphon funds from the corporation.  (*Id*.

¶¶ 7-9, Pg ID 1120.)

Defendants approached Kresch and MCR on February 16, 2012, offering

MCR the opportunity to purchase student loan debt that Defendants claimed would

fit the investing criterion of MCR's debt buying business.  (Am. Compl. ¶ 21, ECF

No. 20 at Pg ID 310; *see also* Kresch Decl. ¶ 6, ECF No. 49-1 at Pg ID 1220.)

Defendants represented that if Plaintiffs invested $500,000 in UCS, the money

4

would be used to purchase Michigan debt portfolios, which MCR could collect. (Kresch Decl. ¶ 14, ECF No. 49-1 at Pg ID 1221.)

During subsequent negotiations between the parties, "Defendants made representations to Plaintiffs that [UCS] had acquired or was contracted to acquire at least $200 million in student loan [debt]." (Kresch Decl. ¶¶ 9-11, ECF No. 49-1 at Pg ID 1220-21.) Defendants represented that UCS was in negotiations to obtain portfolios for Michigan colleges and universities. (*Id.* ¶ 11, Pg ID 1221.) While Plaintiffs do not specify who made these representations, Miller attests that any oral representations to Plaintiffs in 2012 would have been made by Danial Dyak, Chief Operating Officer of UCS. (Miller Decl. ¶ 12, ECF No. 47-1 at Pg ID 1120.) According to Miller, he never made any representations to Kresch or MCR that UCS already owned Michigan debt portfolios. (Miller Decl.¶ 11, ECF No. 47-1 at Pg ID 1120.) In his declaration dated June 8, 2020, Kresch disputes this assertion, claiming that "Miller and others associated with Defendants made definitive and affirmative representations to [him] that they either already owned Michigan portfolios or were in the process of obtaining them." (Kresch Decl. ¶ 27a, ECF No. 49-1 at Pg ID 1224.)

In a February 21, 2012 email from Dyak to Yossi Adler, MCR's Controller, on which Miller was copied, Dyak stated that, as of that date, "UCS has marketed their accounts receivable management … services to over 2,000 Universities and

1,200 Colleges nationwide of which the Company is in active negotiations with

over 400." (ECF No. 47-4 at Pg ID 1163.) Dyak further stated: "To date, the

company has $400 million already booked/under contract for immediate

purchase." (*Id.*) Attached to Dyak's email was a "draft" of UCS' "Internal

Management Accounting Report and Combined Financial Statements" for the year

ending December 31, 2011 and the period from July 28, 2009 to December 31,

2011. (*Id.* at Pg ID 1167-1178.) A balance sheet in the report reflected that UCS

had invested $315,200 in student loan receivables. (*Id.* at Pg ID 1169.)

Also attached to Dyak's February 21 email was "a breakdown of a number

of education institutions in Michigan interested in selling their delinquent student

loan receivables to University Capital." (*Id.* at Pg ID 1163) This list, Plaintiffs

acknowledge in a footnote to their response brief, was in actuality only a list of all

of the institutions of higher education in Michigan. (Pls.' Resp. Br. at 11 n.2, ECF

No. 49 at Pg ID 1212.)

Kresch states in his declaration that Defendants also supplied Plaintiffs with

a document titled "University Capital Solutions, LLC $10,000 Private Equity/Debt

Placement," which is dated January 2012. (Kresch Decl. ¶ 9, ECF No. 49-1 at Pg

ID 1220.) This document conveys that UCS had acquired $200 million in student

loan debt in 2011 and had $457 million under contract. (Placement at 2-3, ECF

No. 47-3 at Pg ID 1154-55.)

On March 7, 2012, USC and MCR entered into a note purchase agreement whereby MCR paid UCS $500,000.  (Am. Compl, Ex. A, ECF No. 20-1.)  On March 14, 2012, with funds provided by Kresch (Kresch Decl. ¶¶ 12-16, ECF No. 49-1 at Pg ID 1221), MCR wired $500,000 to Defendants in accordance with the agreement.  Kresch believed the funds would be used to purchase portfolios of delinquent loans from Michigan higher education institutions and that MCR would be awarded the exclusive right to collect those loans.  (Kresch Decl. ¶ 14, ECF No. 49-1 at Pg ID 1221.)  As part of the note purchase agreement, MCR was provided a Senior Corporate Debenture ("Debenture").  (Mot., Ex. 2, ECF No. 25-2 at Pg ID.)  Pursuant to the Debenture, MCR was to be repaid its $500,000 investment plus 12% interest on March 7, 2013.  (*Id.*)

Dyak passed away on August 13, 2012.  (Miller Decl. ¶ 14, ECF No. 47-1 at Pg ID 1121.)  Kresch learned of Dyak's death "in the summer of 2012" and, on September 27, 2012, met with Miller to see how Defendants planned to proceed without Dyak.  (Kresch Decl. ¶ 17, ECF No. 49-1 at Pg ID 1222; Kresch Dep. at 78, ECF No. 47-2 at Pg ID 1149.)  Kresch testified that by the time he met with Miller, he did not think MCR was going to get Michigan loan portfolios (Kresch Dep. at 73, 78, ECF No. 47-2 at Pg ID 1147, 1149); however, he did believe he was going to be paid on the loan (*id.*)

7

Unable to find an individual with the skills to replace Dyak, UCS concluded that it could not continue as a viable going concern.  (Miller Decl. ¶ 15, ECF No. 47-1 at Pg ID 1121.)  The State of Florida administratively dissolved UCS effective September 27, 2013.  (*id.* ¶ 18, Pg Id 1121; *see also id.* Ex. A, Pg ID 1124.)  The company ceased ongoing business operations prior to the dissolution. (Miller Decl. ¶ 19, ECF No. 47-1 at Pg ID 1133.)  By the time of dissolution, UCS had no money in the bank and owned no tangible assets.  (*Id.* ¶ 21, Pg ID 1122; *see also id.*, Ex. B, Pg ID 1126.)  The last distribution Miller received from UCS as an officer or shareholder was in December 2012, and no one within the company received a distribution upon and after dissolution.  (Miller Decl. ¶¶ 20-21, ECF No. 47-1 at Pg ID 1121-22.)

On or before September 29, 2013, Kresch was informed via email that UCS was being dissolved.  (Kresch Decl. ¶¶ 19-20, ECF No. 49-1 at Pg ID 1222; Kresch Dep. at 58, ECF No. 47-2 at Pg ID 1144; *see also* ECF No. 47-5 at Pg ID 1180.)

The parties agree that, in the meantime, March 7, 2013 passed without UCS repaying MCR the $500,000 due under the Debenture.  (ECF No. 47 at Pg ID 1105; ECF No. 49 at Pg ID 1203; Kresch Dep. at 10, ECF No. 47-2 at Pg ID

1132.)  Kresch states that he did not learn until mid-2014 that UCS did not have

any Michigan portfolios.[1]  (Kresch Decl. ¶ 21, ECF No. 49-1 at Pg ID 1222.)

### III.    Defendants' Arguments

Defendants first assert that Kresch lacks standing to sue for any harm to

MCR because Kresch was not a party to the debenture agreement and, Defendants

maintain, he can produce no evidence that he was directly damaged by the

purported false misrepresentations by Defendants.  Defendants next assert that

Plaintiffs' breach of contract claim is barred by Florida law governing the liability

of dissolved limited liability companies and their shareholders for unknown claims,

Fla. Stat. § 605.0712(3).  With respect to Plaintiffs' fraud and negligent

---

[1] Kresch makes several additional statements in his declaration about where the
$500,000 paid to UCS went.  (*See* Kresch Decl. ¶¶ 19, 23, ECF No. 49-1 at Pg
1222, 1223.)  Specifically, he says that he "learn[ed] from the Illinois Department
of Securities" that the money was not used to purchase loan portfolios but went to
Miller and another UCS employee.  (*Id.*)  Defendants object to this evidence.
(Defs.' Reply Br. at 2-3, ECF No. 51 at Pg ID 1301-02); *see also* Fed. R. Civ. P.
56(c)(2).  The statements in fact do not satisfy Federal Rule of Civil Procedure
56(c)(4) and therefore are not properly considered on summary judgment.  They
are not based on Kresch's personal knowledge, are inadmissible hearsay, and there
is no indication that Plaintiffs possess admissible evidence to support these facts.
*See N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997).
While the Illinois Department of Securities may be, as Plaintiffs assert, the official
state agency responsible for regulating the securities industry in Illinois and
protecting investors from fraud (*see* Pls.' Resp. Br. at 12 n.4, ECF No. 49 at Pg ID
1213), the Court has not been presented with a statement by any officer or
employee from this governmental entity.  Nor has it been presented with any
official agency record reflecting the assertions in Kresch's declaration.
**(Cont'd . . .)**

misrepresentation claims, Defendants argue the claims are time-barred, fail on the

merits, and are not actionable against Miller.  Finally, Defendants contend that

Plaintiffs lack evidence to hold Miller liable under an alter ego theory.

## IV.    Applicable Law & Analysis[2]

### A.    Kresch's Standing

Plaintiffs concede that Kresch lacks standing to assert a breach of contract

claim against Defendants.  (Pls.' Resp. Br. at 5, ECF No. 49 at Pg ID 1206.)

Plaintiffs maintain, however, that Kresch has standing to assert fraud and

misrepresentation claims because he, as MCR's sole shareholder, relied on

Defendants' false statements when deciding to provide MCR with $500,00 to

invest in UCS.  (*Id*. at 5-6, Pg ID 1206-07.)  According to Kresch, MCR otherwise

lacked the funds for this endeavor.  (Kresch Decl. ¶ 15, ECF No. 49-1 at Pg ID

1221.)  Relying on *Maloof v. BT Commercial Corporation*, 261 F. App'x 887, 889

(6th Cir. 2008), Plaintiffs argue that Kresch therefore was directly injured by

Defendants' misrepresentations.  (Pls.' Resp. Br. at 5-6, ECF No. 49 at Pg ID

1206-07.)  *Maloof*, Defendants argue, only supports their argument.

In *Maloof*, the plaintiff alleged fraudulent and corrupt practices by the

defendants, which the plaintiff claimed damaged his corporations and himself as

---

[2] The parties rely on Florida law in their submissions and thus the Court assumes that Florida law governs this action.

their sole shareholder.  261 F. App'x at 887.  The Sixth Circuit affirmed the district

court's dismissal of the case because the plaintiff lacked standing to redress

injuries done to the corporations.  *Id*.  The Sixth Circuit reasoned that, because the

plaintiff did not allege a direct personal injury due to the defendants' alleged

misconduct, "any injury he may have suffered as a consequence of the damage

done to his corporations is derivative."  *Id*. at 889.

The Sixth Circuit's decision in *Maloof* follows Michigan law holding that

"'a suit to enforce corporate rights or to redress or prevent injury to a corporation,

whether arising from a contract or tort, ordinarily must be brought in the name of

the corporation, and not that of a stockholder, officer, or employee.'"  *Meathe v.*

*Ret*, 547 F. App'x 683, 688 (6th Cir. 2013) (quoting *Belle Isle Grill Corp. v.*

*Detroit*, 666 N.W.2d 271, 278 (Mich. Ct. App. 2003)).  This is so "even where one

person owns all the corporate stock."  *Belle Isle Grill Corp.*, 666 N.W.2d at 278

(citation omitted).  There are two exceptions to this rule, where a shareholder will

have standing to sue:

> "when he has sustained a loss separate and distinct from that of other
> stockholders generally," *Christner v. Anderson, Nietzke & Co., PC*,
> 433 Mich. 1, 444 N.W.2d 779, 783 (1989); and (2) if the individual
> "can show a violation of a duty owed directly to the individual that is
> independent of the corporation," *Belle Isle Grill*, 666 N.W.2d at 278.
> However, Michigan case law indicates that those are extremely
> narrow exceptions. "The exception does not arise merely because the
> alleged violation resulted in injury to both the corporation and the
> individual; rather, it is limited to cases in which there is a breach of
> duty that is owed to the individual personally." *Id*. at 278–79.

11

*Meathe*, 547 F. App'x at 689.

Kresch does not allege an injury distinct from MCR.  The $500,000 he gave

to MCR is the same $500,000 that MCR loaned UCS based on Defendants'

misrepresentations.  MCR was most directly injured by the loss of Michigan

portfolios to collect.  Plaintiffs do not identify a duty that Defendants owed

independently to Kresch.  Thus, the Court concludes that Kresch lacks standing to

pursue either of the claims alleged in the Amended Complaint.

**B.    Breach of Contract**

Defendants seek summary judgment with respect to Plaintiffs' breach of

contract claim, asserting that Florida law, Fla. Stat. § 605.0712(3), allows claims

against dissolved limited liability corporations only to the extent of their

undistributed assets unless those assets were distributed after dissolution.  (Defs.'

Br. in Supp. of Mot. at 6-7, ECF No. 47 at Pg ID 1107-08.)  Defendants provide

Miller's declaration to establish that, at the time of its dissolution, UCS did not

have undistributed assets and did not distribute any assets to its shareholders in

dissolution.  (*Id.* at 6, Pg ID 1107.)  Plaintiffs respond that § 605.0712 is not the

correct provision for their claim, which Plaintiffs maintain was a known claim

12

against UCS at the time of its dissolution, and that § 605.0711 instead is applicable.[3]

### i. Liability of UCS

Under Florida law, a limited liability company's existence continues after it has been administratively dissolved. *See* Fla. Stat. § 605.0714(5). A dissolved corporation is permitted *inter alia* to "[p]rosecute and defend actions and proceedings …." *Id.* § 605.0709(2)(b)(2). Dissolution does not "[p]revent commencement of a proceeding by or against the limited liability company in its name." *Id.* § 605.0717(1)(b).

Two provisions of Florida law establish procedures for a dissolved limited liability company to dispose of claims against it. Fla. Stat. §§ 605.0711, .0712. Section 605.0711 addresses "known claims" against the company; section 605.0712 addresses unknown claims. *Id.* "[T]he term 'known claim' … includes unliquidated claims, but does not include a contingent liability that has not matured so that there is no immediate right to bring suit or a claim based on an event occurring after the effective date of dissolution." Fla. Sta. § 605.0711(16).

When UCS was dissolved effective September 27, 2013, its obligation to pay MCR pursuant to the Debenture had well passed—i.e., the claim had matured

---

[3] Plaintiffs also argue that Defendants did not comply with the notice requirements in § 605.0712; however, this argument is not relevant to the subsection of the statute on which Defendants rely.

and MCR had the immediate right to bring a lawsuit for repayment after March 7, 2013 (the date payment was due).  Thus, it was a known claim.  UCS could have disposed of the claim under Florida law by following the various notice procedures set forth in section 605.0711.  Fla Stat. § 605.0711(2)-(7).  It did not, or at least has not presented evidence thus far that it did.

According to section 605.0711, a dissolved limited liability corporation that does not follow the procedures set forth in the statute "shall pay or make reasonable provision to pay all known claims and obligations …."  Fla. Stat. § 605.0711(10).  While "[y]ou can't get blood from a stone[,]" nothing in the statute precludes a party from suing the company in that instance if payment is not made.  Nor does the statute limit a claim to the extent of the company's assets.  If the LLC lacks sufficient funds to pay a known claim, a member of the dissolved LLC may be liable but only to the extent of the "member's … pro rata share of the claim or the amount distributed to the member …, whichever is less."  *Id.* § 605.0711(11).

For these reasons, the Court concludes that UCS is not entitled to summary judgment on MCR's breach of contract claim.

### ii.    Liability of Miller

According to the evidence presented by Defendants, UCS had no assets at the time of its dissolution and it had not made any distributions to shareholders

14

since December 2012. Plaintiffs fail to present admissible evidence to create a

genuine issue of material fact with respect to these factual matters. As such,

Miller's liability for UCS' alleged breach of its agreement with MCR is zero. *See*

Fla. Stat. § 605.0711(11) (limiting a member's liability to his or her "pro rata

share of the claim or the amount distributed to [him upon dissolution], *whichever is*

*less*."). Plaintiffs also fail to produce evidence to demonstrate Miller's liability

under an alter ego theory. At the very least, Plaintiffs present no evidence to show

that Miller "'dominated and controlled [UCS] to such an extent that the

corporation's independent existence was in fact nonexistent and the shareholders

were in fact alter egos of the corporation.'" *Duke Energy Florida, LLC v.*

*FirstEnergy Corp.*, 731 F. App'x 385, 391 (6th Cir. 2018) (quoting *Gasparini v.*

*Pordomingo*, 972 So.2d 1053, 1055 (Fla. Dist. Ct. App. 2008)) (additional citation

omitted).

For these reasons, the Court concludes that Miller is entitled to summary

judgment with respect to MCR's breach of contract claim.

### C.    Fraud Claims

A four-year limitations period is applicable to claims of fraud under Florida

law. *See* Fla. Stat. § 95.11(3)(j). "Absent statutory tolling or another exception,

the Florida statute of limitations begins to run from the time the cause of action

accrues. *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 784 F.3d 771, 778

15

(11th Cir. 2015) (citing Fla Stat. § 95.031).  "'A cause of action accrues when the

last element constituting the cause of action occurs.'"[4]  *Id.* (quoting Fla Stat.

§ 95.031(1)).

Florida law provides a statutory exception to this general rule, known as the

" 'delayed discovery' exception."  *Id.* at 779 (citing *Hearndon v. Graham*, 767

So.2d 1179, 1184 (Fla. 2000)).  Pursuant to this exception, the limitations period

begins to run only when "'the plaintiff either knows or reasonably should have

known of the tortious act giving rise to the cause of action.'"  *Id.* (quoting

*Hearndon*, 767 So.2d at 1184).  Where fraud is alleged, the action "accrues when

'the facts giving rise to the cause of action were discovered or should have been

discovered with the exercise of due diligence.'"  *Id.* (quoting Fla. Stat.

§ 95.031(2)(a)).  "The Florida Supreme Court has explained that the knowledge

required to commence the running of the limitations period under the discovery

rule need 'not rise to that of legal certainty.'"  *Eghnayem v. Boston Scientific*

*Corp.*, 873 F.3d 1304, 1323 (11th Cir. 2017) (quoting *Univ. of Miami v. Bogorff*,

583 So.2d 1000, 1004 (Fla. 1991), holding modified on other grounds by *Tanner v.*

---

[4] The elements of a claim of fraud under Florida law are: "(1) a false
statement concerning a material fact; (2) the representor's knowledge that the
representation is false; (3) an intention that the representation induce another to act
on it; and (4) consequent injury by the party acting in reliance on the
representation." *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) (quoting *Johnson
v. Davis*, 480 So.2d 625 627 (Fla. 1985)).

*Hartog*, 618 So.2d 177 (Fla. 1993)).  Instead, a plaintiff requires only "'notice,

through the exercise of reasonable diligence, of the *possible* invasion of [his or her]

legal rights.'"  *Id.* (emphasis added) (quoting *Bogorff*, 583 So.2d at 1004).

"[U]nder Florida law, a cause of action generally accrues upon the *first*

injury caused by another's wrongful act[.]"  *Kipnis*, 784 F.3d at 779 (emphasis in

original) (citing *City of Miami v. Brooks*, 70 So.2d 306, 308 (Fla. 1954)). As the

Florida Supreme Court explained in *Brooks* and the Eleventh Circuit restated in

*Kipnis*:

> The general rule, of course, is that where an injury, although slight, is
> sustained in consequence of the wrongful act of another, and the law
> affords a remedy therefor, the statute of limitations attaches at once. It
> is not material that all the damages resulting from the act shall have
> been sustained at that time and the running of the statute is not
> postponed by the fact that the actual or substantial damages do not
> occur until a later date.

*Kipnis*, 784 F.3d at 779 (quoting *Brooks*, 70 So.2d at 308).

Plaintiffs' misrepresentation claims are based on "two key representations":

(a) that UCS already owned and/or was looking to purchase Michigan Loan

portfolios; and (b) that UCS intended to use Plaintiffs' $500,000 investment to

purchase loan portfolios."  (*See* Pls.' Resp. Br. at 8-9, ECF No. 49 at Pg ID 1210-

11.)  Kresch states in his declaration that he did not learn that these representations

were false until mid-2014.[5]  (Kresch Decl. ¶¶ 21-24, ECF No. 49-1 at Pg ID 1222-

---

[5] Plaintiffs filed this lawsuit on January 3, 2018.

23.)  Plaintiffs therefore argue that there is a question of fact precluding the determination that their misrepresentation claims are time barred.  However, while there may be a question of fact as to when Kresch knew the representations were false, this does not mean there is a disputed fact as to when he *should have known* with the exercise of reasonable diligence.

Kresch's deposition testimony in this matter makes clear that by September 27, 2012, he did not believe UCS had Michigan portfolios for MCR.  While his knowledge may not have amounted to a "legal certainty," he undoubtedly had notice that UCS had not acquired Michigan portfolios or, at least, was not complying with its representation that it would give MCR the exclusive right to collect those loans in exchange for MCR's $500,000 investment.  The only injuries MCR purportedly suffered as a result of Defendants' misrepresentations were the loss of its investment and the opportunity to collect UCS' loan portfolios in Michigan.  If Plaintiffs were not aware of the possible invasion of their legal rights as of September 2012, they certainly should have been when UCS defaulted on the loan on March 7, 2013, or when Plaintiffs learned in September 2013 that UCS had been dissolved.

As Plaintiffs filed this lawsuit more than four years after even this last date, the misrepresentation claims are time-barred.

## IV.    Conclusion

In summary, the Court concludes that Kresch lacks standing to assert the

alleged breach of contract and misrepresentation claims in Plaintiffs' Amended

Complaint.  The Court does not agree with Defendants that the breach of contract

claim against UCS is barred under Florida law.  Nevertheless, the claim fails

against Miller.  The misrepresentation claims, however, are barred by the

applicable statute of limitations.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF

No. 47) is **GRANTED IN PART AND DENIED IN PART** in that Ari Kresch

and Donald Miller are terminated as parties to this action and only MCR's breach

of contract claim against UCS (Count I), to the extent based on the Debenture,

survives.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: January 26, 2021